## THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE NEW YORK AND HARLEM RAILROAD COMPANY, Appellants, *v.* THE COMMISSIONERS OF TAXES AND ASSESSMENTS OF THE CITY AND COUNTY OF NEW YORK, Respondents.

*City of New York — the sinking of tracks in Fourth avenue is an alteration of a public street — the railroad company cannot be taxed for the tunnels and bridges — it may be taxed for the easement acquired by it in the street — how the easement is to be valued — Laws of 1872, chap. 702.*

Chapter 702 of 1872 providing for the regulating of the grade of the New York and Harlem Railroad Company in Fourth avenue, in the city of New York, above Forty-second street, and the construction of viaducts and bridges over the same, was intended to relieve the public from the great dangers and annoyances of a steam railroad constantly passing and repassing with its locomotives and trains upon the surface of the avenue, by so placing the tracks and structures of the railroad that the avenue might, as far as practicable, be exclusively and safely used by the public, and at the same time the railroad enjoy equal or greater facilities of ingress or egress to and from its depot in the city than before; and the alterations and changes in the avenue are to be considered as, in effect, the laying out or alteration and construction of a street, and the work done and structures erected to put the avenue in the condition required by the act are not a subject of taxation as against the railroad company.

By virtue of the said act the railroad company acquired a perpetual and exclusive easement in the lands upon which its tracks and other appurtenances were constructed, independently of the public generally and of the city, in which the fee of the soil remains.

This easement and the railroad constructed and used upon it are lands within the meaning of the statute relating to taxation, and are to be assessed at their fair value as a portion of a continuous railroad, having its connections and relations with the lines of railroads beyond the city and the terminus within it.

Appeal by the relators from an order of the Special Term sustaining the action of the respondents in the assessment for the purpose of taxation of the real estate of the relators, and quashing a writ of *certiorari* which had previously issued to review the same.

*Chauncey M. Depew,* for the relators.

*William C. Whitney,* for the respondents.

PER CURIAM:

It appears from the return in this case that many years prior to 1872 the relator acquired and had enjoyed the franchise of constructing and operating its railroad upon the Fourth avenue, from Forty-second street to Harlem river, in this city, and thence to Chatham Four Corners, in this State. It also appears that the Fourth avenue was designated as such upon the map or plan of the city, laid out by commissioners appointed for that purpose under the act of 1807 (ch. 95), and that it was subsequently opened as a public avenue under and pursuant to the provisions of the act of April 9, 1813, (ch. 86), entitled "An act to reduce several laws relating particularly to the city of New York into one act." It further appears that in 1872 an act was passed by the legislature, chapter 702, Laws of that year, entitled "An act to improve and regulate the use of the Fourth avenue in the city of New York," and which by its terms authorized and required the relator to regulate the grade of their railroad in the Fourth avenue, and to construct viaducts, foot and road bridges over the same, and to make excavations and tunnels under the same, with openings for proper ventilation, for the purpose of rendering the same safe and convenient to any persons crossing the same, and for all railroad trains and passengers traveling thereon, in the manner prescribed in the act. This enactment also provided for a board of engineers, whose duty it was to execute, direct and superintend the construction of the improvement, and which was to be called the "Board of Engineers for the Fourth Avenue Improvement." It was to consist of four members, namely, Allan Campbell and Alfred W. Craven or their successors, the chief engineer of the board of public works of the city of New York for the time being, and the engineer of the relator. The duty was imposed upon the board to prepare the plans and specifications of the improvement in conformity with the act, and also to make an estimate of the expense thereof, and file a copy of the plans, specifications and estimate in the office of the comptroller of the city of New York. The members of the board were required, before entering upon the performance of their duties, severally to take and subscribe an oath or affirmation before some judge of a court of record, faithfully to perform the trust and duty required of them by the act as a member of such board of engin-

eers. It was also provided that the cost of the improvement should be borne and paid for by the relator and the mayor, aldermen and commonalty of the city, in equal proportions, as the construction of the improvement progressed. It was declared by section nine that the mayor, aldermen and commonalty were not to obstruct the improvement or the use of the Fourth avenue for the purpose of accomplishing it, and they were authorized and directed to pass such ordinances as might be requisite or necessary to facilitate it. It was further declared that the tunnel and railway should be exclusively for the use and purpose of the railroad company, and that it should not be lawful for any person or persons, other than a public officer in the execution of his duty as such, with his agents and assistants, to enter upon or pass upon or through the same or any portion thereof on foot or in any other way than in the proper cars of the relator provided for that purpose, or in such trains of other railroads as should have obtained the consent of the relator, without the sanction of the corporation, under a penalty. It was also provided that the board of engineers should begin the improvement and proceed with the completion thereof with reasonable expedition. And it was further declared that when completed the railroad company were authorized and directed to run their trains over the improvement and in and upon their depot at Forty-second street and the switches, turnouts and sidings then authorized by law north of said street. The legislature reserved the right to alter, amend or repeal the act at any time.

It will be perceived that the engineers designated were officers of the city with one exception, namely, the engineer of the relator, and that it was their duty to superintend the construction of the improvement which was of the Fourth avenue; and that they were required, in accordance with the general rule relating to such subject to take an oath of office. This improvement having been made in accordance with the statute (*supra*), the respondents imposed a tax upon the relator by assessing as real estate, the tracks, substructures, superstructures, stations, viaducts and masonry by which the improvement was accomplished, and of this the relator complains as unjust under all the circumstances detailed.

In approaching the consideration of the question involved, it should be borne in mind that the relator had for many years

enjoyed the franchise of constructing and operating its road upon the Fourth avenue as laid out from Forty-second street to the Harlem river, and that the improvement contemplated did not confer upon the relator any new franchise, but provided for its use in a different mode which rendered it necessary, under the requirements of the act, for the company to expend a large sum of money.

It is apparent, therefore, that although exclusive privileges were granted to the relator, that the act was designed to improve the Fourth avenue as it then existed, and in the manner contemplated by the provisions of the act.

The appointment of persons as engineers who were to make the plans and to superintend the completion of the improvement, was analagous to the appointment of commissioners to open a street, and the result, notwithstanding that the relator was to pay one-half the expense attendant upon it, was that when the improvement was finished, it belonged to the city of New York, subject only to the easement created by the act in favor of the relator. In other words, it was the construction of a way by tunneling and excavating through and upon the Fourth avenue, leaving the original grade of the street in some parts of the route undisturbed.

It is apparent, from the provisions of the act, that the use of the Fourth avenue by the relator was regarded, in view of its employment of steam as a motive power, as a franchise dangerous to the life and property of citizens, which the improvement was designed to remove to a great extent, if not entirely. In this respect, decreasing as it did the dangers theretofore existing by the construction, for instance, of bridges and viaducts which in no way enhanced the value of the relator's franchise, but was for the public benefit, it was an improvement of the Fourth avenue; and doubtless the equal division of the expense between the relator and the city arose from the exclusive privilege granted to the relator in the use of the track, and the greater safety resulting to the citizens of the city from its creation, the relator having, as already suggested, thitherto enjoyed the more dangerous franchise of using the Fourth avenue as laid out for the transaction of its business. The effect of this combination, notwithstanding the exclusive privileges granted to the relator, was, therefore, to improve, as designed, a public street, and not to create a private way, over which the city

continued its legislative power, not only impliedly but directly, inasmuch as the act itself reserved the right to the public officers of the city to enter and pass through and over the improvement in any way and at any time. From these views it follows that whatever structures or superstructures were necessary to accomplish the purpose contemplated became a part of a public street, and therefore were not liable to taxation.

It follows, also, from these views that the tunnels, tracks, substructures, superstructures, stations, viaducts and masonry embraced in the improvement were not all taxable as real estate, and that the only taxation to which the railroad could be lawfully subjected would be that to which it would be liable on the assumption that the rails were laid on the Fourth avenue without reference to the tunneling, excavation and masonry work, which, in part or in whole, constituted the improvement under the act of 1872, and which was in part paid for by the relator.

This case is *sui generis*, and presents features entirely different from any of the cases to which we have been referred on the argument, and for which no parallel has been found in the books. But the conclusions at which we have arrived are, that the alterations and changes of the Fourth avenue, under the act of 1872, so far as they relate to the avenue itself, and its restoration to the conditions provided for by the act, and to its support and use as a public street, were in effect the laying out or alteration and construction of a street, and that the work and structures done and erected for the purpose of putting and maintaining the avenue for public use in the condition required by the act, though done at the joint expense of the city and the railroad company, are to be regarded as parts of a public street, and as such are not subject to taxation against the railroad company. They became necessary in order to accomplish the purposes of the act, which were to relieve the public from the great dangers and annoyances of a steam railroad constantly passing and repassing with its locomotives and trains upon the surface of the avenue, by so placing the tracks and structures of the railroad that the avenue might, as far as practicable, be exclusively and safely used by the public, and at the same time the railroad enjoy equal or greater facilities of ingress and egress to and from its depot in the city. The railroad was, there-

fore, wherever practicable, isolated from the street by the construction of tunnels, bridges, walls and arches which were not so much essential to the use of the railroad as to the public enjoyment of the avenue.

The result of all the work and expenditure of moneys under the act of 1872 has been to put the railroad company into the enjoyment of a perpetual and exclusive easement in lands upon which its tracks and the other appurtenances of the railroad are constructed, independently of the public generally and of the city, in which the fee of the soil remains. This easement and the railroad conducted and used upon it are lands within the meaning of the statutes relating to taxation (*People ex rel. Dunkirk, etc., R. R. Co.* v. *Cassity,* 46 N. Y., 46), and this property is to be assessed at its fair value for what it constitutes, to wit, a portion of a continuous railroad, having its connections and relations with the lines of railroad beyond the city and the terminus within the city. Its fair value as a property of that character, considered with a view to its use by the relator and its lessees, is the subject of careful consideration by the assessors. (*People ex rel. Buffalo, etc., R. R. Co.* v. *Barker,* 48 N. Y., 70.)

The return discloses that the assessors took into consideration the masonry, arches, walls, bridges and structures necessary to uphold and maintain the avenue and to carry the cross streets over the railroad for public use as though they were the property of the railroad company.

They are not the property of the company, nor, indeed, are they essential to the enjoyment of its road, for the railroad could be used without or with them, but the avenue and the street, since the change in the sites of the tracks, could not be used without them.

We are constrained, therefore, to reverse the proceedings of the commissioners and remand the case for further proceedings.

Present — DAVIS, P. J., and BRADY, J.

Proceedings reversed and case remitted for further proceedings.